# Supreme Court of Texas

No. 22-1149

Roger Borgelt, Mark Pulliam, Jay Wiley, and the State of Texas,

*Petitioners*,

v.

Austin Firefighters Association, IAFF Local 975; City of Austin; and Marc A. Ott, in his official capacity as the City Manager of the City of Austin,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued February 21, 2024**

JUSTICE YOUNG delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Blacklock, Justice Bland, and Justice Huddle joined.

JUSTICE BUSBY filed an opinion dissenting in part and concurring in the judgment in part, in which Justice Boyd and Justice Devine joined.

Several "Gift Clauses" of the Texas Constitution prohibit governmental entities from making "gifts" of public resources to private parties. We must decide whether article 10 of the collective-bargaining agreement that governs the relationship between the City of Austin and

its firefighters makes such a gift. Petitioners allege that it does—that it impermissibly benefits the Austin Firefighters Association, the union that represents firefighters and that negotiated the agreement with the City. Article 10 grants 5,600 hours of "Association Business Leave" so that those undertaking various activities may do so using a special category of paid time off. Each year, moreover, the Association's president may use 2,080 of those hours—enough to be on leave essentially all the time. Other firefighters may use the rest. Petitioners contend that this leave time has been misused for improper purposes, which undergirds their theory that article 10 amounts to an unconstitutional gift to the union.

We do not dispute the seriousness of petitioners' allegations. To the contrary, they are sufficiently weighty that the court of appeals erred by granting relief to the Association under the Texas Citizens Participation Act, including the award of fees and sanctions. But as it comes to us, this case turns on the meaning of the collective-bargaining agreement, which is a governmental contract. Article 10's text and context impose limits on the use of "Association Business Leave" that prohibit the kind of improper uses that petitioners allege. Those contractual limits are essential to avoiding a Gift Clause problem. The challenged conduct that petitioners allege and respondents dispute, in other words, is not authorized by or the necessary fruit of the agreement; it would breach that agreement. Under ordinary contract-interpretation principles, which the doctrine of constitutional avoidance magnifies because this is a *governmental* contract, we must read the agreement to authorize only lawful conduct. We therefore cannot conclude that article 10 itself violates the Gift Clauses.

2

This result does not mean that we endorse any conduct that petitioners claim supports their view that article 10 is unconstitutional. We do not suggest that parties may wrap themselves in a contract that is formally constitutional only to regularly engage in the very conduct that their contract forbids. The Gift Clauses would be a dead letter if they could be honored in name yet ignored in practice. The record in this case, however, provides no basis for us to declare an "as implemented" or "as applied" violation of the Gift Clauses, which would require far more than occasional breaches of the agreement. The trial court's findings of fact went unchallenged, and the resulting appeal below and in this Court has focused primarily on whether the agreement itself inescapably violates the Gift Clauses under our precedents. We now resolve that question. But going forward, if the parties to the agreement do not abide by the agreement's terms, there will be time enough—and soon—for a Gift Clause challenge to be based on a clear record. We assume, however, that the parties will adhere to their agreement.

Accordingly, we affirm the judgment below in part and reverse and render judgment in part.

## I

The legislature has determined that the "policy of this state is that fire fighters . . . , like employees in the private sector, should have the right to organize for collective bargaining, as collective bargaining is a fair and practical method for determining compensation and other conditions of employment." Tex. Loc. Gov't Code § 174.002(b). By referendum election, the City's voters have "chosen the Collective Bargaining Process as a fair and orderly way of conducting its relations

3

with Austin Fire Fighters." Since then, the City has executed multiple collective-bargaining agreements.

In 2017, the Association and the City executed the collective-bargaining agreement at issue.[1] The agreement's purpose, as recited in its preamble, is to "achieve and maintain harmonious relations between the parties, and to establish benefits, rates of pay, hours of work, and other terms and conditions of employment for all members of the bargaining unit." The preamble also recites that "the Association has pledged to support the service and mission of the Austin Fire Department," and "to constructively support the goals and objectives of the Austin Fire Department." The agreement contains thirty-two articles as well as seven appendices. Included, for example, are provisions relating to "Work Furloughs" (article 6), "Association Dues & Payroll Deductions" (article 7), "Wages & Benefits" (article 9), "Hours of Work"

---

[1] The agreement at issue here became effective in October 2017 but expired in September 2022, subject to thirty-day extensions not to exceed six total months. Petitioners contend and no party disputes that, while the agreement has expired, the case is not moot because the City and the Association executed a new collective-bargaining agreement in 2023 that does not materially vary from the old one. We have not found a copy of the new agreement in the record. At oral argument, Borgelt's counsel represented that he would "get [us] the record citation" for the new agreement, but we have received no supplemental filings. No party contested the representation about the new agreement, however, and we have independently located a copy on the City of Austin's public website. *See Fire Collective Bargaining Agreement*, austintexas.gov, https://www.austintexas.gov/page/fire-collective-bargaining-agreement (last visited June 25, 2024). There are some differences between the new and old leave provisions, but, like the parties, we find those differences to be immaterial and thus agree with the parties that the case is not moot. *See, e.g.*, *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) ("capable of repetition, yet evading review" doctrine). Our discussion and quotation of the agreement reference the 2017 version that is in our record.

4

(article 14), "Overtime" (article 15), "Investigations & Disciplinary Actions" (article 18), and many more.

Disputed here is article 10, which we attach as an appendix to this opinion. Article 10 is a short provision—it takes up two of the agreement's 105 pages—titled "Association Business Leave." (Like the parties, we surrender to the initialism "ABL" when referring to Association Business Leave.) Under article 10, ABL is "paid time off" during which authorized Association representatives can conduct "Association business activities." Association business is defined in article 10, § 1(B) ("Permitted Uses of ABL"), to include time spent in collective bargaining, adjusting grievances, attending dispute-resolution proceedings, addressing cadet classes, and attending union conferences and meetings. By contrast, article 10 expressly prohibits using ABL for political activities, with some exceptions that are not relevant here. Article 10 does not require or permit the City to pay any money to the Association; rather, authorized representatives using ABL "receive their ordinary City salaries, benefits, and pensions." These costs, in turn, are funded through the City's budget, primarily by property and sales taxes. The Association does not pay any portion of ABL—that is, it does not reimburse the City for the pay and benefits that the City expends when firefighters use ABL.

Under article 10, the City contributes 5,600 ABL hours each year "to a pool of leave time which may be used in accordance with [article 10]." The Association's president may use 2,080 of those hours, which equates to forty hours a week. The City firefighter designated as the Association president, in other words, can be deemed to be working full time but, during all of it, be on "leave" to conduct Association business activities.

5

Other authorized Association representatives may use the remaining hours. They need not be union members to do so.[2] Firefighters cannot use ABL at will. The parties have stipulated that a "requester cannot use ABL without approval beforehand from the AFA President and the Fire Chief's Designee."[3] Article 10's text requires that the department's fire chief (or designee) "shall approve timely ABL requests, subject only to the operational needs of the Department." (Our subsequent references to the fire chief encompass the chief and the chief's "designee.") According to the record, the department has denied requests for ABL, but only rarely.

Petitioners challenging the ABL provision's constitutionality include Roger Borgelt, an Austin resident and taxpayer, and the State.[4] They allege that City firefighters have used ABL for improper purposes.

---

[2] Testimony in the record indicates that firefighters who were not members of the Association have used ABL time. Nothing in the text of article 10 limits its use to union members. Given the construction of article 10 that we describe below, *see infra* Part II.B, ABL time cannot properly be denied to non-union members because of that status. We agree with the State, in other words, that limiting ABL to union members would be problematic, but disagree that the contract allows such a restriction.

[3] We express no view of whether ABL could be granted even if the Association's leadership did not approve it. Nor need we express any view of the duty imposed on the Association that runs to all firefighters, union members or otherwise, in exercising its apparent authority to grant or deny ABL requests.

[4] The court of appeals fairly described this dispute's procedural background, which began in 2016, as "complex." 684 S.W.3d 819, 825 (Tex. App.—Austin 2022). The original plaintiffs were Mark Pulliam and Jay Wiley (also Austin taxpayers), who sued the Association, the City, and the City Manager (all references to the "City" include the City Manager unless otherwise specified) regarding article 10 in a predecessor collective-bargaining agreement. Via amended pleadings, their claims regarding the predecessor agreement carried forward to the 2017 agreement.

For example, they say that the Association president routinely uses ABL for unauthorized political activities like supporting and opposing candidates in elections. They say other authorized Association representatives improperly use ABL hours for "other association business" like "attending private charitable events (e.g., 'a gala,' a boxing match called 'Battle of the Badges,' 'fishing fundraisers') and meetings of the [Association's] 'political action committee.'" According to petitioners, City firefighters are using taxpayer-funded ABL to benefit themselves or the Association rather than doing the work the City hired them to do: fight fires. ABL allegedly costs the City over $200,000 a year.

The lawsuit sought a declaration that article 10 is unconstitutional under several of the Texas Constitution's Gift Clauses, *see* Tex. Const. art. III, §§ 50, 51, 52(a); *id.* art. XVI, § 6(a), and an injunction barring article 10 from having any further effect, *see Osborne v. Keith*, 177 S.W.2d 198, 200 (Tex. 1944) ("This court recognizes the right of a taxpaying citizen to maintain an action in a court of equity to enjoin public officials from expending public funds under a contract that is void or illegal."). The State intervened on behalf of the plaintiffs "to protect the constitutional rights of taxpayers" and "defend the rule of law." It sought the same relief. No party challenges that intervention.

The Association moved to dismiss under the Texas Citizens Participation Act. It argued that the lawsuit was "entirely meritless" and would "serve no purpose going forward other than to chill [Association] members' exercise of their right of association." The Association requested dismissal, plus costs, fees, and sanctions.

In early 2017, the trial court granted the Association's motion,

7

dismissed all claims against the Association with prejudice, and ordered that the Association recover its fees and costs.[5] Despite being dismissed, the Association intervened back into the litigation to defend article 10's constitutionality, together with the City. In 2018, the Association and the City jointly moved for summary judgment on this issue, as did the taxpayers and the State. The Association separately moved for fees, costs, and sanctions in accordance with the trial court's 2017 order granting the Association's TCPA motion.

In 2019, the trial court partially granted and partially denied the City and the Association's summary-judgment motion. The court granted the motion "as to any claims related to the . . . agreement itself and the terms therein." But the court denied the motion "with regard to the implementation of such contract by the City." The court denied the State and the taxpayers' summary-judgment motion. Finally, the court granted the Association $115,250 in fees and $75,000 in sanctions for the TCPA dismissal. Several months later, one of the original plaintiffs, Pulliam, nonsuited his claims against the City. Nearly a year after that, Wiley—now joined by Borgelt, who joined the litigation about four years after it began—filed a second amended petition against the City. The pleading continued to request the same relief. A few days later, Wiley

---

[5] The taxpayers and the State took related interlocutory appeals, both of which were dismissed for want of jurisdiction and have no bearing on our decision. *See Pulliam v. City of Austin*, No. 03-17-00131-CV, 2017 WL 1404745 (Tex. App.—Austin Apr. 14, 2017, no pet.); *State v. City of Austin*, No. 03-17-00131-CV, 2017 WL 4582603 (Tex. App.—Austin Oct. 11, 2017, no pet.). Another unrelated interlocutory appeal, which was later dismissed upon unopposed motion, likewise has no bearing on today's decision. *See City of Austin v. Pulliam*, No. 03-18-00306-CV, 2018 WL 3321197 (Tex. App.—Austin July 6, 2018, no pet.).

8

nonsuited his claims against the City, leaving Borgelt as the only remaining individual plaintiff.[6]

The case proceeded to a bench trial in 2021 to determine the constitutionality of the City's implementation of article 10. Finding no constitutional problem, the trial court rendered a final judgment for the City. The judgment ordered that Borgelt and the State take nothing and that their claims against the City be dismissed with prejudice. The court also ordered "that Mark Pulliam and Jay Wiley shall pay the [Association] the amount of $190,250" for the Association's meritorious TCPA motion.

Upon petitioners' request, the trial court entered findings of fact and conclusions of law. The court did not make any direct findings or conclusions that ABL had been used for improper purposes.[7] Nor did the court make requested findings that certain allegedly unlawful ABL uses had occurred. The court found that the Austin Fire Department's and the Association's missions "overlap," the "City does not give any public funds to the [Association]," and the agreement "benefits the public in general."

---

[6] Pulliam and Wiley nonetheless remain parties to this appeal to challenge the TCPA fees and sanctions.

[7] Both parties agree that at least some ABL is used for Association business activities like collective bargaining, adjusting grievances, attending dispute resolution proceedings, addressing cadet classes, and attending union conferences and meetings. The trial court, however, made no specific findings regarding ABL usage except for the following: "[The Austin Fire Department] has authorized firefighters' use of ABL to compete in the Fire Fighter Combat Challenge event, which promotes firefighter fitness and furthers the Department's mission of maintaining a healthy and highly performing workforce"; "The [Association] uses ABL for 'other association business' including station visits"; and "The [Association] uses ABL for 'other association business' including organizing and working third-party charity events."

It found that the City "can and do[es] review the written requests for ABL . . . and has denied those requests when they do not comply with [article] 10 . . . or when the requests would interfere with the operational needs of the department." The court concluded that article 10, whether as written or as implemented, does not violate any Gift Clause and "accomplishes a predominantly public purpose and is not predominantly a benefit to private parties."

The court of appeals affirmed. 684 S.W.3d 819 (Tex. App.—Austin 2022). Petitioners did not challenge the trial court's findings of fact. Applying our precedent in *Texas Municipal League Intergovernmental Risk Pool v. Texas Workers' Compensation Commission*, 74 S.W.3d 377 (Tex. 2002), the court concluded that article 10 is not gratuitous, and that the article "(1) serves a legitimate public purpose and (2) affords a clear public benefit received in return." 684 S.W.3d at 833–40. The court also upheld the trial court's orders requiring Pulliam and Wiley to pay the Association fees and sanctions under the TCPA. *See id.* at 840–48.

## II

Petitioners invoke four provisions of our Constitution, each of which is a Gift Clause. *See* Tex. Const. art. III, §§ 50, 51, 52(a); *id.* art. XVI, § 6(a). The issue before us is whether article 10 as written violates any of those provisions.[8] We focus on Article III, § 52(a), which was also

___

[8] We focus on this legal issue like the court of appeals did and the parties largely do, but the dissent focuses on something else: whether the historical use of ABL proves that the parties *violated* article 10 enough that, even if article 10 itself complies with the Gift Clauses, the parties' conduct still violated the Gift Clauses. The dissent repeatedly asserts that one thing or another is "conclusively established" (or "shown" or "demonstrated"). We are not persuaded. To the

10

the Gift Clause at issue in *Texas Municipal League* and is the parties' primary focus. Counsel for Borgelt, for example, suggested at argument that § 52(a) provides the "clearest example" of a Gift Clause violation here. No party has argued that any other provision would generate a different outcome, so we assume without deciding that none would.

We accordingly proceed by applying § 52(a), which we also call "the Gift Clause." Its text provides as follows:

> Except as otherwise provided by this section, the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever . . . .

Tex. Const. art. III, § 52(a). This Gift Clause was adopted in 1876 and its

---

contrary, we are satisfied that any "as implemented" or "as applied" challenge is unavailing. The dissent asserts facts as "conclusively established" far more than petitioners do; their arguments about article 10's facial unconstitutionality dwarf any contentions about article 10 being unconstitutionally implemented. Petitioners did not challenge the trial court's findings of fact, and—with respect to our colleague—the record makes clear that the parties hotly dispute the core facts. "When findings of fact are filed and are unchallenged, as here, they occupy the same position and are entitled to the same weight as the verdict of a jury." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). "We defer to unchallenged findings of fact that are supported by some evidence." *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014); *cf. Medina v. Zuniga*, 593 S.W.3d 238, 247 (Tex. 2019) ("In reviewing a verdict for legal sufficiency, we must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." (internal quotation marks omitted)).

Accordingly, even if the dissent cited more snippets from the record than it does, we would still conclude that the facial challenge is the only viable path in this Court. We criticize petitioners for none of this—quite the opposite. Clarifying our Gift Clause jurisprudence as a matter of law is well worthwhile and can inform future cases (if needed).

11

text has not been materially modified since then.

Although the text refers to the legislature,[9] all parties here agree that the Gift Clause fully applies not only to legislative enactments but to municipal contracts like the one at issue.[10] They differ only in *how* it applies, and it is that dispute that we resolve. Several points, however, are readily established. First, the Gift Clause prohibits gifts to "association[s]," which the Association is. Next, it forbids the City from "lend[ing] its credit" or "grant[ing] public money or thing of value" to the Association; "public money" at least pays for ABL time, which itself may be an (intangible) "thing of value." What the parties contest, in essence, is whether article 10 improperly "grant[s]" City money to the Association.

We read the constitutional text not in a vacuum but also through the lenses of history and precedent. This Court has long recognized the

---

[9] The other cited Article III Gift Clauses likewise textually target legislative exercises of power: "The Legislature shall have no power . . . ." *See* Tex. Const. art. III, §§ 50, 51. Article XVI, § 6(a) addresses "appropriation[s] for private or individual purposes." The City has not disclaimed the applicability of the other Gift Clauses to a municipal contract and so we assume that they apply equally to a city.

Notably, although no party has cited it, our Constitution also contains a Gift Clause specifically relevant to local governments. *See* Tex. Const. art. XI, § 3 ("No county, city, or other municipal corporation shall hereafter become a subscriber to the capital of any private corporation or association, or make any appropriation or donation to the same, or in anywise loan its credit . . . ."); *see City of Cleburne v. Gulf, C. & S.F. Ry. Co.*, 1 S.W. 342, 342 (Tex. 1886) ("The object of [art. XI, § 3] was to deprive municipalities of the power possessed by them under the constitution of 1869 in the exercise of which many counties and towns in the state assumed burdens not yet discharged, in anticipation of benefits never realized."). We express no opinion about whether this provision has any meaning that is materially distinct from § 52(a) or the other Gift Clauses that the parties cite.

[10] For purposes of this case, therefore, we also assume without deciding that § 52(a) applies to municipal contracts.

12

historical role and context of our Constitution's Gift Clauses, which were not merely abstract enactments to pursue a concept of good government, but also responded to concrete issues. For example, in the nineteenth century, local governments often sought to entice the construction of railroads within their territory by lending their credit to finance construction loans. *See City of Cleburne v. Gulf, C. & S.F. Ry. Co.*, 1 S.W. 342, 342 (Tex. 1886) (noting how "many counties and towns . . . assumed burdens not yet discharged, in anticipation of benefits never realized"). Resulting financial problems exposed "gross corruption" in the political system, and as a reaction to these problems, the framers of our 1876 Constitution "frequently cast in extremely restrictive language" the prohibitions on public spending for private purposes. George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 232 (1977). The Gift Clauses were conceived against the backdrop of these financial and political troubles.[11]

This general history provides at least some context, and it is conceivable that further analysis of the Gift Clauses' original public meaning—and whether there is any variation from clause to clause—

---

[11] *See generally* David E. Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach*, 111 U. Pa. L. Rev. 265, 280 (1963) ("[T]here was practically no public control over the planning of the railroad project or over the actual expenditures of publicly contributed funds. These functions were completely delegated to private corporate officials."). "The experience of the nineteenth century taught that public funds must be subject to public control." Richard M. Jones, *The Future of Moral Obligation Bonds as a Method of Government Finance in Texas*, 54 Tex. L. Rev. 314, 318 (1976); *see also* Mike Willatt, *Constitutional Restrictions on Use of Public Money and Public Credit*, 38 Tex. B.J. 413, 422 (1975) ("To insure that the political subdivision receives its consideration, viz., accomplishment of the public purpose, the political subdivision must retain some degree of control over the performance of the contract.").

could assist the courts and the public in understanding their contours. The parties here, however, have not identified any such basis for departing from our Gift Clause precedent.

Instead, they have all focused on our decision in *Texas Municipal League*. Consistent with their briefing, petitioners at oral argument represented that this case presents a "straightforward application" of that case, which they ask us to apply.[12] Respondents have likewise focused on that case's requirements. *Texas Municipal League* concerned whether state statutes rather than a local contract violated § 52(a),[13] but it articulated broader principles. Given the parties' positions, we confine ourselves today to applying that precedent here.

*Texas Municipal League* began with an anti-gratuity requirement. Section 52(a)'s prohibition of granting public money meant, we explained, that the legislature could not lawfully require cities to make "*gratuitous*

---

[12] The State's merits briefing suggests that lower courts' application of *Texas Municipal League* has begun to conflict with the Gift Clause's original public meaning, but the State's counsel clarified at oral argument that the State is "certainly not advocating that the Court overturn *Texas Municipal League*" itself. Rather, the State explained that the "easiest way for the Court to resolve the Gift Clause question is through a straightforward application of *Texas Municipal League*." Likewise, for example, Borgelt's counsel said this case "is in fact a straightforward application of *Texas Municipal League*."

[13] *Texas Municipal League* involved an as-applied constitutional challenge to two statutory provisions. *See* 74 S.W.3d at 379. "A facial challenge claims that a statute, by its terms, always operates unconstitutionally. By contrast, an as-applied challenge asserts that a statute, while generally constitutional, operates unconstitutionally as to the claimant because of her particular circumstances." *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 702 (Tex. 2014). It is unclear whether or to what extent this doctrine applies when challenging a governmental *contract* as unconstitutional, but in any event, we do not understand petitioners to argue that article 10 operates unconstitutionally as to them because of their "particular circumstances." Rather, their facial challenge argues that article 10 operates unconstitutionally in all circumstances.

14

payments to individuals, associations, or corporations." 74 S.W.3d at 383. A challenged expenditure (like the ABL time here) cannot escape characterization as an unconstitutional gift without surviving that threshold inquiry. But even if it does, there is more. The Gift Clause "does not prohibit payments" when they satisfy two prongs—first, they must "serve[] a legitimate public purpose," and second, they must "afford[] a clear public benefit received in return." *Id.* The "legitimate public purpose" prong itself splits into a "three-part test," *id.* at 384, several parts of which overlap with both the anti-gratuity requirement and the "clear public benefit" prong.[14]

Without changing *Texas Municipal League*'s requirements—something no party asks us to do—we can consolidate its various cumbersome "tests" and "requirements" and "prongs" into three principles. A challenged expenditure satisfies § 52(a)'s Gift Clause when (1) the expenditure is not gratuitous but instead brings a public benefit; (2) the predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party; *and* (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished. If article 10 meets all three principles—

---

[14] Specifically, *Texas Municipal League* articulated the three-part test to satisfy the "legitimate public purpose" prong as: "the Legislature must: (1) ensure that the statute's predominant purpose is to accomplish a public purpose, not to benefit private parties; (2) retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment; and (3) ensure that the political subdivision receives a return benefit." 74 S.W.3d at 384. We treated this third test as automatically satisfied by our analysis of the anti-gratuity requirement, *id.* at 385, and we treated the second ("clear public benefit") prong as largely the same as the first prong's first ("legitimate public purpose") test, *id.*

public benefit, public purpose, and public control—then it does not violate the Gift Clause.[15]

We recognize that principles like these are not themselves the constitutional text. They instead usefully reflect how courts can neutrally, predictably, and reliably apply the Constitution's mandate when undertaking the delicate task of assessing the actions of the other branches of our government. Courts must unflinchingly enforce the law, of course. But they must also rigorously distinguish between policy conflicts and legal questions. Under our Constitution, policy choices belong to the other branches, and the judiciary may not second-guess them. Precedents that are faithful to the constitutional text help us, and everyone else, maintain clear lines of demarcation between policy and law. Consistent resolution of cases in light of those precedents, in turn, ensures that the courts' decisions flow from settled rules rather than ad hoc reactions to various governmental actions. That consistency gives the other branches and the public the ability to plan their affairs with greater confidence that they are following the law and that those plans, once undertaken, will not be tossed aside inexplicably. As we said in *Texas Municipal League*, therefore, we "presume" that legislative bodies intend their acts "to comply with the United States and Texas Constitutions, to achieve a just and reasonable result, and to advance a public rather than a private interest." 74 S.W.3d at 381. "The burden is on the party attacking [the expenditure] to show that it is unconstitutional." *Id.*

---

[15] To be clear, by stating the test in this way, we aim only to eliminate the complexity of how *Texas Municipal League* articulated the test, but disclaim any substantive deviation from its analysis or from the precedents that it cited.

With this starting point, we examine in turn the three principles drawn from our Gift Clause jurisprudence.

**A**

We begin with whether article 10 is a "gratuitous" transfer or one that brings a "public benefit." As we explained in *Texas Municipal League*, "[a] political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration." *Id.* at 383. There need be "only sufficient—not equal—return consideration to render a political subdivision's paying public funds constitutional." *Id.* at 384. Viewed as a whole, the collective-bargaining agreement satisfies this requirement. The agreement was negotiated to establish benefits, wages, hours, and other employment terms and conditions for City firefighters who, in exchange, agree to abide by those terms and conditions in providing firefighting services to the City, including risking their lives for the public. The agreement is not remotely so one-sided that anyone could perceive a failure of consideration.

Petitioners ask us, however, to analyze the consideration not for the agreement as a whole but for article 10 by itself. For the courts, such an undertaking—particularly as to a *contract*—is fraught with complication.

Contracts, after all, are typically negotiated as a unit. Parties routinely make concessions in one provision so that, in another, they might obtain something they value more. Beyond that, contractual provisions are separate from each other only because that is how they are drafted. Consider a hypothetical two-article governmental contract, in which article 1 provides that a private party will supply 100 widgets, each worth two dollars, and article 2 states that "the government shall pay the

17

private party $200." If read in isolation, article 2 would be an unconstitutional "gift."

The Gift Clause does not supplant the basic contract-law principle that "we do not read contractual phrases in isolation," *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 808 (Tex. 2023), any more than it supplants the same principle for the interpretation of any other legal instrument. Slicing a contract into its constituent parts artificially treats a contract as no more than a collection of mini-contracts, each of which must have its own consideration.

On the other hand, if the Gift Clause applies to contracts at all, *refusing* to assess individual provisions would allow a city to make an otherwise impermissible gift simply by inserting it into a larger contract. Contractual clauses must survive scrutiny on their own, but that does not require or authorize reading them in isolation. Getting the balance right is important.

It is perhaps fortunate that this case does not require us to determine where the line is; we can reserve that question for a case in which it will be dispositive. It is not dispositive here because article 10 itself, particularly when viewed through the contextual lens of the agreement's preamble, provides adequate consideration and thus satisfies the first requirement of *Texas Municipal League*.

Article 10 does not authorize "giv[ing] away" anything. *See post* at 20 (Busby, J., dissenting in part). It is not a "no strings attached" gratuity because it authorizes ordinary salaries and benefits for firefighters who, in exchange, perform business activities related to

18

their employment when using ABL time.[16]  Specifically, ABL must be used for activities—like collective-bargaining negotiations, adjusting grievances, dispute-resolution proceedings, addressing cadet classes, and attending union conferences—that are presumably proper and provide sufficient return consideration for the City.  Each activity is authorized and proper *to the extent* that it furthers the agreement's overarching purpose of achieving and maintaining harmonious relations.  Each activity is further limited by the Association's recited pledge of "support[ing] the service and mission of the Austin Fire Department." According to article 10's plain terms, the related business activities, whether undertaken by the Association's president or anyone else, must advance the interest of the Austin Fire Department.

The fire chief must approve all requests to use ABL.  Article 10's express delineation of permissible ABL uses (and of some categorically prohibited ones) means that neither the Association's president nor the fire chief may approve requests that the text does not authorize.  If an activity *is* permissible and requested under article 10's procedures, the chief must approve it, unless "the operational needs of the Department" require otherwise.  In short, nothing in article 10 leads to the conclusion that it does not support the overarching purposes of the collective-bargaining agreement.

The result would be the same even if we did not conclude that article 10's text unambiguously reflects the restrictions on ABL use that

---

[16] The dissent acknowledges that article 10 would only be unconstitutional if it authorized expenditures of public funds "for uses not related to . . . governmental duties," or for no particular use at all, *i.e.*, "as a gratuity."  *Post* at 5 (Busby, J., dissenting in part).

19

we describe in this opinion. The doctrine of constitutional avoidance, which "allows courts to *avoid* the decision of constitutional questions" when presented with "competing plausible interpretations of a statutory text," would require us to give the contract a construction that steers clear of such constitutional difficulties unless the text foreclosed that construction. *Clark v. Martinez*, 543 U.S. 371, 381 (2005); *see also Paxton v. Longoria*, 646 S.W.3d 532, 539 (Tex. 2022). After all, when courts scrutinize the other branches' actions or enactments, we start with the presumption that the rest of the government, no less than the judiciary, intends to comply with the Constitution. This principle is commonly invoked in the context of statutory interpretation.[17] Compared to statutes, contracts are far less frequently subjected to constitutional attack—but when they are, the same underlying principle applies. Courts have no more reason to read a contract than a statute as pushing the bounds of constitutionality.[18] In fact, courts must

---

[17] *See, e.g.*, *Koy v. Schneider*, 221 S.W. 880, 888 (Tex. 1920) ("In determining the constitutionality of an act of the Legislature, courts always presume in the first place that the act is constitutional. They also presume that the Legislature acted with integrity, and with an honest purpose to keep within the restrictions and limitations laid down by the Constitution." (quoting 1 John Lewis & J.G. Sutherland, *Statutes and Statutory Construction* § 82 (2d ed. 1904))); *Ashford v. Goodwin*, 131 S.W. 535, 537 (Tex. 1910) ("When the Legislature passed that act, they must, in the discharge of their duty, have determined that the power to so enact was conferred upon that body by the language [of the Constitution].").

[18] *See, e.g.*, *United States v. Winstar Corp.*, 518 U.S. 839, 875 (1996) (plurality op.) (explaining how the unmistakability doctrine in contract law serves "[t]he same function of constitutional avoidance" by "avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power" when a prior government contract allegedly contracted away sovereign responsibilities).

interpret even *private* contracts to avoid a construction that renders the contract unlawful.[19] It is doubly important, therefore, for courts to read a *governmental* contract to avoid constitutional issues unless its text makes such an interpretation impossible.

We conclude, therefore, that neither the agreement as a whole nor article 10 individually authorizes a gratuitous payment or transfer to the Association.

**B**

We next analyze whether the predominant objective is to accomplish a legitimate public purpose, not to provide a private benefit. *See Tex. Mun. League*, 74 S.W.3d at 383; *see also Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 740 (Tex. 1995) ("A transfer of funds for a public purpose, with a clear public benefit received in return, does not amount to a lending of credit or grant of public funds in violation of article III, sections 51 and 52.").

Said more directly, *some* private benefit will almost inevitably arise from government payments to non-government entities or individuals; the Gift Clause does not treat such an inevitability as a poison pill that

---

[19] *Tex. Emps.' Ins. Ass'n v. Tabor*, 283 S.W. 779, 780 (Tex. Comm'n App. 1926, judgm't adopted) ("[P]arties are presumed to know the law, and are likewise presumed to intend that their agreement shall have legal effect."). Contracts are therefore to be interpreted to avoid illegality. *See* Restatement (Second) of Contracts § 203 ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 483 (Tex. 2016) ("A contract that could have been performed in a legal manner will not be declared void because it may have been performed in an illegal manner." (quoting *Lewis v. Davis*, 199 S.W.2d 146, 149 (Tex. 1947))).

dooms a much larger public objective. *See, e.g.*, *City of Aransas Pass v. Keeling*, 247 S.W. 818, 819 (Tex. 1923) (holding that the construction of "sea walls and breakwaters on the Gulf coast, though of special benefit to particular communities, must be regarded as promoting the general welfare and prosperity of the state"). At the same time, however, it is easy to adorn an otherwise-illegal transfer to a private recipient with a mere bauble of public purpose. Even if such a transfer technically complies with the "gratuity" requirement, the Gift Clause still forbids a transfer when the public purpose is the caboose rather than the engine.

As with the enactments at issue in *Texas Municipal League*, we presume that article 10's predominant purpose is to accomplish a legitimate public purpose unless petitioners show that it clearly is not. 74 S.W.3d at 381. "What is a public purpose cannot be answered by any precise definition further than to state that if an object is beneficial to the inhabitants and directly connected with the local government it will be considered a public purpose." *Davis v. City of Taylor*, 67 S.W.2d 1033, 1034 (Tex. 1934) (quoting 6 Eugene McQuillin, *Law of Municipal Corporations* 292 (2d ed. 1928), and discussing Tex. Const. art. VIII, § 3, which requires that taxes be levied "for public purposes only"). "Suffice it to say that, unless a court can say that the purposes for which public funds are expended are *clearly not* public purposes, it would not be justified in holding invalid a legislative act . . . providing funds for such purposes." *Davis v. City of Lubbock*, 326 S.W.2d 699, 709 (Tex. 1959) (emphasis added) (quoting *Davis v. City of Taylor*, 67 S.W.2d at 1034).

These standards protect the separation of powers and advance the principle of self-government. The other branches of government, no less

22

than the courts, are obligated to follow the law and to serve the public; challengers must show, and not ask the judiciary to assume, that the policy-making branches have done otherwise. Petitioners have not made this showing here because we cannot read article 10 to be so dissociated from accomplishing legitimate public purposes. Under article 10, "Association business activities" is a key *limitation*, even if it at first blush sounds like an unlimited grant to the union.

ABL's uses are restricted by § 1(B)(1) and (2) of article 10, which both address "Association business activities." The Association's president, for example, is authorized to "use ABL for any lawful *Association business activities* consistent with the Association's purposes." (Emphasis added.) Other authorized representatives may use ABL for "*Association business activities* that directly support the mission of the Department or the Association, but do not otherwise violate the specific terms of [article 10]." (Emphasis added.) So even if something is an "Association business activity," other restrictions in the text—like the president's limitation to activities "consistent with the Association's purposes" or the various additional limits on other firefighters—*further* confine how ABL may be used. Said differently, ABL is unavailable unless the contemplated endeavor falls under "Association business activities" as defined in the agreement *and* is not restricted by the additional text in § 1(B)(1) and (2) of article 10.

The key question, then, is what "Association business activities" means. Two provisions of the agreement govern this term: article 10 itself, which defines "Association business," and article 1 (the agreement's preamble), which constrains the scope of permissible "Association

business activities."

Article 10 defines "Association business" as "time spent in Collective Bargaining negotiations; adjusting grievances, attending dispute resolution proceedings, addressing cadet classes during cadet training . . . , and attending union conferences and meetings."[20]  While some of these examples *could* be read to reach non-public purposes, the text does not "clearly" contemplate such a use.  Properly understood, each enumerated example relates to maintaining a stable employment relationship between the City and its firefighters and ensuring that the fire department better serves the public.  Even in otherwise barring "the use of ABL for legislative and/or political activities" "[a]t the local level," article 10 exempts from this proscription only "raising concerns regarding firefighter safety," which is a high public purpose, not merely a private concern.  In other words, we read article 10's authorizations as limited to circumstances that advance the important public purposes of the larger agreement, even if accomplishing those purposes also leads to some collateral private benefit.  This reading is consistent with our duty to construe the provision as constitutional if we can, as well as the constitutional mandate that the public purpose predominate over any

---

[20] There is some dispute about whether this definition operates to define "Association business" for purposes of ABL usage by the Association president *and* other authorized Association representatives, or just the latter.  We read it to apply to both because the same term is used in both and the term is defined. The definition is in § 1(B)(2), which is focused on "Authorized Association Representatives," but nothing suggests that the same term would have a different meaning.  The definition's location, in other words, does not displace the definition's clarity.  We note, moreover, that the new collective bargaining agreement, *see supra* note 1, even more clearly uses the definition for both the president and for others.

incidental private benefit.

The text itself confirms this understanding. The agreement's preamble states:

> WHEREAS, the Association has pledged to support the service and mission of the Austin Fire Department, to constructively support the goals and objectives of the Austin Fire Department, and to abide by the statutorily imposed no strike or work slowdown obligations placed upon it;
>
> WHEREAS, it is the intent and purpose of this Agreement to achieve and maintain harmonious relations between the parties, and to establish benefits, rates of pay, hours of work, and other terms and conditions of employment for all members of the bargaining unit and to provide for the equitable and orderly adjustment of grievances that may arise during the term of this Agreement . . . .

From these recitals there is no "clear" indication that using ABL to conduct "Association business" authorizes improper, private purposes. Association business instead contemplates activities that (1) are consistent with the Association's affirmative pledge to support the City's Fire Department,[21] (2) "maintain harmonious relations" between the City and its firefighters, and (3) establish "conditions of employment" and provide for the "adjustment of grievances." Put another way, we conclude

---

[21] The dissent refers to the Association's mission as being "distinct from the Fire Department's mission," as if their respective missions are mutually exclusive. *Post* at 2. There are undoubtedly distinctions, but article 10 reaches only the parts of the missions that coincide. The dissent disregards the Association's contractual obligation to support the Department. The trial court's unchallenged factual findings that the "missions of the [Department] and [Association] overlap and are not mutually exclusive," and that the Association's mission "includes furthering professional standards for firefighters, promoting fire fighter and public safety, and working towards more harmonious labor relations," reflect the point that any parts of the Association's mission that do not intersect with the Department's are not proper bases for ABL.

25

that these recitals unambiguously reflect the parties' intent to use ABL in a way that benefits the public.

Borgelt argues that some of these activities, like collective bargaining or dispute-resolution and grievance proceedings, amount to requiring the City to pay the employee to use ABL only to assume an "*adverse* or *adversarial*" role in representing other firefighters "*against* the City." This complaint, we agree, has some force. We do not dispute that paying for such things *could* violate the Gift Clause for several reasons. Something purely adverse to the public interest would presumably never qualify as predominantly serving the *public* interest. So if a governmental contract had as its goal paying for something whose purpose was solely to oppose the government, it would be quite hard to see any plausible public benefit. Suppose that the City chose (unilaterally, not as part of a contract) to pay for political consultants or lobbyists whenever an individual firefighter wanted to attack the department's policies or positions. Such a blank check might "at best [be] a gratuity, a bonus to the employé. The [C]ity might as well pay his doctor's fee, his grocer's bill, or grant him a pension." *City of Tyler v. Tex. Emps.' Ins. Ass'n*, 288 S.W. 409, 412 (Tex. Comm'n App. 1926, judgm't adopted).[22]

But as we explained above, *supra* Part II.A, article 10 is not a gratuity. Instead, it is a negotiated benefit available to *all* City firefighters, including those who are not members of the union.[23] The

---

[22] We express no view of how the judges who wrote *City of Tyler* would regard modern government programs dealing with the three issues to which it alludes—publicly paid health insurance, food stamps and other cash transfers, and the like.

[23] Petitioners and the dissent suggest that, to the extent the ABL scheme

legislature has decreed that it is Texas policy to regard "collective bargaining [as] a fair and practical method for determining compensation and other conditions of employment" for firefighters. Tex. Loc. Gov't Code § 174.002(b). And properly adjusting grievances is, for that matter, not entirely "adverse" to the City's interest—doing so relates to the sound management of the department, not just the self-interest of the person who files a grievance or is the subject of discipline. Yielding accurate results from these processes is why the department has grievance processes. Proper resolution serves the public interest. If, as part of a negotiated employee benefit, ABL facilitates the streamlined and efficient resolution of grievances in ways that benefit both the firefighters and the

is considered a form of compensation to all firefighters, the scheme violates the First Amendment by compelling firefighters who are not members of the union to subsidize union speech. *See Janus v. Am. Fed'n of State, County, & Mun. Emps., Council 31*, 585 U.S. 878 (2018). Collective-bargaining agreements could compel speech that would implicate the free-speech provisions of the U.S. and Texas Constitutions, but it is far from clear how this one could do so. At issue in *Janus* was an Illinois law forcing public employees "to subsidize a union, even if they choose not to join and strongly object to the positions the union takes in collective bargaining and related activities." *Id.* at 884–85. The Supreme Court held that the law "violates the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern." *Id.* at 885–86. Here, article 10 does not require non-members to subsidize or participate in ABL. Those who use ABL receive their normal salary and benefits, as with any paid-time-off provision. In any event, no potentially aggrieved firefighter has brought a First Amendment challenge and the parties do not directly claim such a violation.

Further, our decision confirms that the scope of authorized ABL is narrow, that ABL is available to all firefighters, and that ABL is in no sense property *of the union*. These holdings mean that article 10 functions quite differently from the understanding of article 10 that petitioners suggest would violate the First Amendment. Indeed, as construed, article 10's "benefit" is rather like many other collectively bargained benefits that employees may use but elect not to do so. In any event, we need not *foreclose* a free-speech challenge; if one is brought, the courts will address it in the ordinary course.

City, such ABL uses advance a public purpose—or, at the very least, it is not clear that they do not. In any event, our construction of "Association business activities" categorically excludes activities that lack a clear nexus to a predominant and legitimate public purpose, *even if* one might otherwise call such activities "Association business." ABL that is used to undermine the City *without* advancing a public interest would pose quite a different scenario.

Given this construction, we cannot say that the agreement goes beyond a policy decision that the City is authorized to make when engaging in negotiations. *See Davis v. City of Taylor*, 67 S.W.2d at 1034 (recognizing that a legislative body, in deciding "what are public purposes . . . is vested with a large discretion which cannot be controlled by the courts, except, perhaps, where its action is clearly evasive, and where, under pretence of a lawful authority, it has assumed to exercise one that is unlawful" (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 155 (5th ed. 1883))). We do not and are not asked to *endorse* article 10; we simply conclude that, whether ABL is wise or foolish, the agreement's text constrains ABL to uses that satisfy our "public purpose" jurisprudence.

The bulk of petitioners' remaining complaint about article 10 is that the Association president and other authorized representatives improperly use ABL for political activities and "other Association business" such as fishing fundraisers, boxing matches, parties, and the like. Petitioners invoke these examples to show *why* article 10 must be unlawful—if it allows such things, then how could it be lawful? But even

28

if we were to assume that these examples constituted improper uses of ABL,[24] they could not overcome our textual analysis of article 10. For one thing, these complained-of activities are notably absent from the trial court's findings of fact, which petitioners did not challenge at the court of appeals and which they do not ask us to supplement, alter, or disregard. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986) (stating that "unchallenged" findings of fact "are binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding"); *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988) ("appellate courts are not authorized to substitute their findings for those of the jury"). For another, article 10 does not authorize but *forbids* uses of ABL that do not satisfy the requirements we have described. As respondents agree, that provision expressly prohibits using ABL for "political activities,"[25] with a few narrow exceptions relating to firefighter safety and employment conditions. *See* Appendix, *infra*.

As to the other alleged misuses, even assuming that they have occurred other than on errant one-off occasions, they would constitute

---

[24] While petitioners attack such examples as self-evidently unlawful, the Association president's testimony suggests a more complicated context: "Every time ABL leave is used for one of these events . . . , it's used to help conduct the event, not to participate in the event. So the fishing tournament, people aren't going fishing. They're working the event. They're setting it up. They're making sure the event goes well." Because our resolution is confined to article 10's meaning and its constitutionality, we need not and do not resolve the disputed and factbound questions of whether or to what extent any particular example of ABL use was proper or improper under our construction of article 10.

[25] We note that some of these limitations may be grounded in existing law. *See, e.g.*, Tex. Loc. Gov't Code § 143.086(a) ("While in uniform or on active duty, a fire fighter or police officer may not take an active part in another person's political campaign for an elective position of the municipality.").

29

potential violations, not manifestations, of article 10. The City and the Association must abide by the agreement's terms, which we have construed. On that basis, the presumption that article 10 itself serves a predominantly public purpose stands unrebutted. Even if they do not so abide, a *breach* of contract is not necessarily evidence that the *contract is itself* unconstitutional.[26] For example, payments to a firefighter who wrongfully reported that he worked (or used ABL time) on a given day (or similar violations) could be addressed by employment law, contract law, the law of fraud, or even criminal law. Not all contractual violations (indeed, very few) are of *constitutional* significance. If it were otherwise, all aspects of government functioning would become constitutionalized under the Gift Clause, effectively turning Texas courts into full-time hall monitors who oversee the minute operations of the rest of the government. The Gift Clause is important, but it was not intended as a tool for the judiciary to elevate itself above the other branches.

## C

Lastly, the City must also "retain public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment." *Tex. Mun. League*, 74 S.W.3d at 384; *see also Jefferson County v. Bd. of County & Dist. Rd. Indebtedness*, 182 S.W.2d 908, 913 (Tex. 1944) (observing that certain funds were not granted for

---

[26] As we discuss below, parties who execute a contract that (if obeyed) satisfies the Gift Clause could still be subject to a Gift Clause claim if their implementation of the contract indicates sufficient disregard of the contract's requirements. *See infra* Part II.C.

"unrestricted use").[27]  Put another way, the City cannot make a "no-strings-attached" payment to the Association.  Under the collective-bargaining agreement, the City "retain[s]" at least two direct, contractual controls over article 10.

First is control over how ABL is used.  Article 10 does not authorize ABL for just *any* purpose.[28]  Article 10 instead requires that ABL be used for the Association business activities described above—activities that we understand to be far more circumscribed in scope to be authorized under article 10 than petitioners allege.  The fire chief, a City employee, must approve ABL requests, "subject only to the operational needs of the Department."  But the chief retains authority to deny ABL use for unauthorized purposes—that is, he *should* deny ABL for any activity that does not fit within article 10.[29]  The chief likewise has the authority—

---

[27] *See supra* note 11 and accompanying text (describing the historical origins of the Texas Gift Clauses).

[28] The Association's president testified that firefighters using ABL cannot use it for whatever they choose; they could not, for example, use ABL to go on vacation with their family or to stay at home and watch television all day. This contrasts, for example, with a separate article in the agreement, article 12, providing for "vacation leave," under which firefighters may presumably receive their salaries and benefits without the City controlling how they spend their individual vacation time *at all*.  Petitioners do not contend that the "vacation leave" provision poses any Gift Clause concerns.

[29] The fire chief's designee who oversaw reviewing and approving ABL requests confirmed that City approval was needed for ABL, that he sought to exercise this authority to keep approved ABL within article 10's limits, and that in several instances (including a political one) he exercised that authority to deny ABL. We express no view regarding any particular exercise of judgment or the process leading to the exercise of judgment, but reiterate that the record makes it difficult at best to disregard the trial court's unchallenged finding that the City properly "has denied ABL requests that . . . do not comply with Art. 10 of the CBA."

indeed, the duty—to deny even the purest uses of ABL if the department's operational needs require otherwise.

Second is managerial control over firefighters using ABL. Under article 4 of the agreement, the City expressly retains the right to manage the fire department and its work force. Included is "the right to discipline or discharge in accordance with Chapter 143 and this Agreement." If a firefighter uses ABL for improper purposes, the City may impose discipline, including potentially terminating the firefighter's employment.

The dissent declines to engage either of these controls. Instead, the dissent repeatedly invokes *Texas Municipal League* for the proposition that how ABL is "commonly used" conclusively establishes that the City has not actually exercised control over the funds to ensure that article 10's public purpose is accomplished.[30] *Post* at 2, 10. The dissent then converts the trial court's findings that the City *knew* of no improper activities into a denunciation of the City's "head-in-the-sand approach." *Id.* at 15. To the contrary, as we have repeatedly explained,

---

[30] The dissent is mistaken to assert that the record "conclusively shows" that ABL was "commonly used for private purposes, including association political activities." *Post* at 9–10. The dissent's beliefs aside, respondents heavily dispute this point: "[The Association president] repeatedly testified that he did *not* use ABL for any political or lobbying activities." The dissent cites trial testimony for the proposition that "the president himself admitted that he routinely used publicly funded leave for political activities." *Id.* at 13 & n.12. Yet the president testified, "Like I've testified over and over, my work week is well over 40 hours, and I believe that I am *not* on ABL when I'm doing political activities." (Emphasis added.) Petitioners requested the trial court to make findings such as that the Association president "engages in political activities while on ABL," but the trial court made no such findings. Again, on the record before us, we can make matter-of-law determinations concerning the agreement's meaning and the Gift Clause's requirements—but this case does not permit the factbound analysis that drives the dissent.

the implementation facts are heavily disputed and the trial court's findings after a bench trial were wholly inconsistent with the "facts" on which the dissent relies.

Article 10 does not disclaim the retained control that the Gift Clause mandates. To the contrary, it in no uncertain terms limits ABL to the defined business activities, is subject to the City's approval both for compliance with article 10's limits and for overriding departmental needs, and is checked by the City's managerial authority over ABL users. As with *Texas Municipal League*'s other requirements, we assume that the parties will comply with these requirements.

Today's case, in other words, does not allow us to define with any specificity the standards that would govern such an "as implemented" or "as applied" Gift Clause violation that might be found under a different record—one, for example, with a conclusive showing that parties to an agreement like this one regularly fail to fulfill its public purpose or refuse to "retain" the controls that their contract allows. *Tex. Mun. League*, 74 S.W.3d at 384. It is enough for today to recognize that such conduct would be tantamount to permitting what the Gift Clause forbids. Future cases, if they are brought, will need to address the complex line-drawing questions that will arise, such as how to determine when the parties to a contract have treated it with sufficient disregard to constitute an "as implemented" or "as applied" Gift Clause violation.

The basic principle, however, is clear enough—that even if a contract itself satisfies the Gift Clause, the parties' conduct in implementing it may not. The Gift Clause must be obeyed in reality, not just in form; it bars the government from handing over property for

33

nothing, *with or without* a contract that on paper is above reproach. It is necessary but not sufficient for an agreement's terms to comply with the Gift Clause. A contract that is constitutional on its face does not preclude an "as implemented" or "as applied" Gift Clause challenge.

The question we address today, though, is whether article 10 as written violates the Gift Clause, and we hold that it does not. The City and the Association have an obligation to ensure that article 10 is implemented consistently with its requirements as described in our decision. If they or others similarly situated do not, the courts will be open to entertain a future case built on a different record.

\* \* \*

We hold that article 10 is not invalid under Article III, § 52(a). But petitioners' concerns are far from frivolous. Various options for Gift Clause litigation under our existing jurisprudence are already available, as we have stated. The legislature, however, is not limited to that existing framework. If the legislature concludes that greater restraints are necessary to ensure obedience to the Gift Clause, it can create new mechanisms to hold local governments accountable. It could impose limitations on how governmental units offer employment benefits, require greater public transparency, or provide oversight to ensure compliance with contracts that, at least formally, satisfy the Constitution. It could also conclude that, even if they formally comply with the Gift Clause, contractual terms for ABL or similar devices entail too great a risk of evading public controls or of being subverted to private purposes, and on that basis prohibit such provisions altogether as a prophylactic matter. The judiciary need not be the only part of the government that focuses on the Gift Clause and the values it represents.

34

## III

We finally turn to the TCPA dispute between the Association and the original plaintiffs, Pulliam and Wiley. We conclude that, at the time of the hearing, the lawsuit exceeded the minimum standards needed to survive the Association's motion to dismiss. The plaintiffs' contentions were weighty and sufficiently supported, a point amplified by the complexities of the law and this record that our resolution of the appeal have revealed. We hold that the trial court erred in granting the TCPA motion, so the awards of fees and sanctions must also be reversed.

As by now is more than familiar, the legislature enacted the TCPA "to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits." *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015). "The TCPA was designed to protect both a defendant's rights of speech, petition, and association and a claimant's right to pursue valid legal claims for injuries the defendant caused." *Montelongo v. Abrea*, 622 S.W.3d 290, 295 (Tex. 2021). In large measure, our voluminous TCPA jurisprudence tells the story of how Texas courts labor to account for both interests.

Expedited dismissal becomes available when a movant establishes that a "legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." Tex. Civ. Prac. & Rem. Code § 27.005(b).[31] The

---

[31] The Association filed its TCPA motion to dismiss in November 2016, which means that the statute's prior version controls this case. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 11–12, 2019 Tex. Gen. Laws 684, 687 (providing that amendments apply to actions filed on or after September 1, 2019). Accordingly, all references to the statute are to the applicable 2013 version.

35

parties dispute whether, as a matter of law, the Association can or did make this initial showing. We need not resolve that dispute, however, because—even assuming that the Association met its requisite burden—the plaintiffs made "by clear and specific evidence a prima facie case for each essential element of the claim in question," *id.* § 27.005(c), which means that the district court should have denied the TCPA motion to dismiss.[32]

We reiterate that plaintiffs' rebuttal burden is not remotely equivalent to requiring early proof that the plaintiffs will ultimately prevail. As we put it last Term, "[t]he Act does not select for plaintiffs certain to succeed; it screens out plaintiffs certain to fail—those who cannot support their claims with clear and specific evidence." *USA Lending Grp., Inc. v. Winstead PC*, 669 S.W.3d 195, 205 (Tex. 2023). The burden is to produce only "the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Lipsky*, 460 S.W.3d at 590 (internal quotation marks omitted). At the TCPA hearing, the trial court was presented with many of the same arguments and evidence that petitioners have placed before us—more than enough to make the case that they have pursued throughout the legal system.[33]

---

[32] The parties also dispute two other legal points that, because of our resolution, we need not decide. First, Pulliam and Wiley contend that the Association, having chosen to intervene back into the case after successfully seeking dismissal from it, is estopped from pursuing relief under the TCPA. Second, Pulliam and Wiley contend that, when a plaintiff is challenging the lawfulness of *government* conduct, no party may respond by invoking the TCPA. We reserve these questions for another case, if one ever arises, in which they will affect the outcome.

[33] For example, petitioners included a copy of the collective-bargaining

The evidence was more than sufficient to raise serious questions about whether the ABL scheme violated our Gift Clause jurisprudence.

Even assuming, therefore, that the TCPA may play a role in a case like this one—a question, again, that we do not address—its applicability was displaced here. To reach that conclusion, we need not rely on the fact that the trial court, based on materially the same evidence and arguments available at the TCPA hearing, required a trial on the merits regarding article 10's implementation. But we agree with petitioners, at least, that the need for the trial illustrates that the case is hardly the kind of slam-dunk for which the TCPA was enacted.

Indeed, affirming the court of appeals' merits judgment does not mean that we perceive no serious problems in the ABL scheme. To the contrary, our decision today upholds article 10 because its unambiguous terms satisfy the Gift Clause. Our resulting legal conclusions in no way warrant the view that the strong medicine of the TCPA was an appropriate response to the lawsuit. The opposite is true.

The trial court erred in granting respondents' TCPA motion to dismiss. Accordingly, we reverse the trial court's order granting attorneys' fees and sanctions to respondents.

---

agreement, and the Association president testified at length. Petitioners presented evidence that the vast bulk of ABL time was used to conduct "other association business," which included attending fundraising galas, fishing trips, boxing events, and other things that most people would consider private purposes. Likewise, there was evidence that the City disapproved only four out of 356 ABL requests over a two-year span, raising questions about the requisite "control" by the City.

**IV**

We reverse the court of appeals' judgment that affirmed the trial court's TCPA order of dismissal and its award of sanctions and fees against Pulliam and Wiley and, as to those issues, render judgment for Pulliam and Wiley. We otherwise affirm the court's judgment.

_____
Evan A. Young
Justice

**OPINION DELIVERED:** June 28, 2024

38

# APPENDIX

## ARTICLE 10
## ASSOCIATION BUSINESS LEAVE

**Section 1.  Association Business Leave**

### A.  Creation of Association Business Leave

Authorized Association Representatives shall be permitted to have paid time off, designated as Association Business Leave (ABL), to conduct Association business under the conditions specified in this Article.

### B.  Permitted Uses of ABL

1. The Association President may use ABL for any lawful Association business activities consistent with the Association's purposes.

2.  For other Authorized Association Representatives, ABL may be used for Association business activities that directly support the mission of the Department or the Association, but do not otherwise violate the specific terms of this Article. Association business is defined as time spent in Collective Bargaining negotiations; adjusting grievances, attending dispute resolution proceedings, addressing cadet classes during cadet training (with prior approval of the time and content by the Fire Chief, or his/her designee), and attending union conferences and meetings. It is specifically understood and agreed that ABL shall not be utilized for legislative and/or political activities at the State or National level, unless those activities relate to the wages, rates of pay, hours of employment, or conditions of work affecting the members of the bargaining unit. At the local level, the use of ABL for legislative and/or political activities shall be limited to raising concerns regarding firefighter safety. Association Business Leave shall not be utilized for legislative and/or political activities related to any election of public officials or City Charter amendments. Association Business Leave shall not be utilized for legislative and/or political activities that are sponsored or supported by the Association's Political Action Committee(s). Association Business Leave shall not be utilized for legislative and/or political activities at the local, state, or national levels that are contrary to the City's adopted legislative program. No Association Business Leave shall be utilized for activities prohibited by

Section 143.086 of Chapter 143 or by the Texas Ethics Commission. Nothing contained in this Subsection is intended to limit the use of the individual firefighter's vacation time for legislative and/or political activities.

### C. Written Request Required

All requests for ABL must be in writing and submitted at least 3 business days in advance to HQ support staff. To be considered timely, the request must be received in person, by fax, or by e-mail by noon of the day notice is due.

### D. Approval of ABL Requests

The Fire Chief or the Fire Chiefs [*sic*] designee shall approve timely ABL requests, subject only to the operational needs of the Department.

## Section 2. Funding and Administration of the Association Business Leave Pool

### A. Manner of Funding

For the timeframe between the effective date of this Agreement and through December 31, 2017, the City will fund a pro rata number of hours of Association Business Leave to a pool of leave time to be used in accordance with this Article. Beginning January 1, 2018, and each subsequent year during the term of this Agreement, during the first ten (10) days of the calendar year, the City will contribute 5,600 hours of Association Business Leave to a pool of leave time which may be used in accordance with this Article. The City will track deductions from the pool as Association Business Leave is used.

### B. Administration of Pool

Up to one thousand (1,000) hours remaining at the end of a calendar year will remain in the pool for use in the following year. However, at no time may the pool exceed sixty six hundred (6,600) hours. Up to one thousand (1000) hours in the pool at the end of the Agreement will be available for use in the following year for Association Business Leave activities. The City and the Association shall track utilization of ABL.

### C. Use of Association Business Leave by Association President

Beginning January 1, 2018, the Association President shall be permitted up to 2080 hours of Association Business Leave from the pool balance per year, less accrued leave time, which must be used under AFD policies, and shall be assigned to a 40 hour work week. The Association President shall account for all leave time taken under such status through the Fire Chiefs [*sic*] office and such time shall be subtracted from the Association leave pool. The Association President will not be entitled to overtime pay from the City for any hours using ABL leave. The Association President may at any time be required to return to duty if an emergency situation exists. The Association President may also be assigned to any special projects at the discretion of the Fire Chief. The pool balance will not be reduced by any hours that the President actually works at the direction of the Fire Chief. At the end of his/her term, the Association President will be allowed to return to the assignment s/he occupied before commencing ABL to perform duties as Association President.

### D. Administrative Procedures

Administrative procedures and details regarding the implementation of this Article shall be specified in Departmental policy.